**Roy Otis KRIDLER, Appellant,**

v.

**BITUMINOUS CASUALTY CORPORA-
TION et al., Appellees.**

No. 24364.

United States Court of Appeals
Fifth Circuit.

March 13, 1969.

John P. Keegan, New Orleans, La., for appellant.

Henry B. Alsobrook, Jr., of Adams & Reese, New Orleans, La., for Bituminous Casualty Corporation and Aetna Casualty and Surety Co.

John J. Weigel, of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Travelers Ins. Co.

Before JONES and GODBOLD, Circuit Judges, and SCOTT, District Judge.

GODBOLD, Circuit Judge:

The appellant, employed by B & T Construction Co., Inc. as a practical surveyor, was injured while at work on a construction site. A bulldozer was engaged in pushing debris, trees, stumps and limbs. A tree or tree limb in the debris, moving with a whipping or lashing motion, struck appellant from behind in the area behind the left knee.

The accident occurred May 21, 1961. Appellant was hospitalized that day and remained in the hospital for approximately three to four weeks. The treating physician last saw him, as an outpatient, on June 13, 1961.

Appellant, who was subject to the Louisiana Workmen's Compensation Law, was paid workmen's compensation benefits by Bituminous Casualty Company, the insurer of B & T, for twelve weeks at $35.00 per week, total $420.00, plus $91.20 medical expense. Benefits were discontinued around August 20. In mid-October, 1961 appellant sought and obtained employment as a survey instrument man with a different employer, Brown & Root, Inc. The first day on the new job, October 18, 1961, he suffered a second injury, a fractured pelvis, when he was accidentally crushed against a tractor.

Appellant filed two suits in the Eastern District of Louisiana, one relating to each accident. The suit relating to the second accident, against Highlands Insurance Company, the compensation carrier for Brown & Root, was tried first. The district judge found appellant had recovered from the pelvic fracture and denied benefits. This Court affirmed. Kridler v. Highlands Insurance Company, 372 F.2d 945 (5th Cir. 1967).

In the instant case claims were asserted for tort damages and for workmen's compensation benefits arising from the first accident. Pursuant to the Louisiana Direct Action Statute the tort claim was asserted against Travelers Insurance Company, the liability insurer of Cortez Construction, which owned the bulldozer. The claim for workmen's compensation benefits was asserted against Bituminous Casualty (the insurer of B & T) and Aetna Casualty (the insurer of Union Texas Natural Gas Corporation, the prime contractor under which B & T was a subcontractor). The case was tried before a different judge than tried the *Highlands* case.[1] At the conclusion of plaintiff's case the judge granted a directed verdict in favor of Travelers. He then proceeded, without a jury, to complete the hearing of the claims against Bituminous and Aetna and denied recovery.

1

The directed verdict in favor of Travelers.

The judge directed the verdict in favor of Travelers on the theory that appellant had failed to show any negligence by the bulldozer operator and was himself guilty of gross contributory negligence.[2]

---

1. Before trial appellant moved to have the instant case tried before the same judge. The motion was denied.

2. As another ground for its motion Travelers asserted that B & T and Cortez were engaged in a joint venture, and that this

The evidence shows that Cortez was operating two bulldozers in the clearing work. Appellant was performing survey work and staking out the right of way for the railroad spur that was to be constructed.

The testimony concerning the accident itself came entirely from appellant. One of the machines ran over and crushed the drinking water jug. Appellant left the site, secured a jar, and filled it with water for the workers. On his return he walked about 300 feet from his pickup truck to where the Cortez machine which struck him was operating.

He came to a stop facing the bulldozer, which was then 20 to 30 feet away. It was operating at low speed and pushing debris three feet or more high. He held the water jar out at shoulder height to display it to the operator. At that time there was nothing between them to

barred appellant from a tort claim against Cortez (and Travelers as Cortez's liability insurer). In his oral statement made when announcing that the motion was granted, the judge referred to joint venture as having been established beyond reasonable doubt. However, in his formal findings of fact and conclusions of law entered at the close of the trial, he found that Union Texas was engaged in a clearing operation and had contracted the job to B & T, which in turn sub-contracted part of the work to Cortez, and that a Cortez employee was operating the machine that pushed the debris into appellant. This disposes of the joint venture argument made by Travelers in this Court. However, because of the possibility of the issue arising in another trial we point out that proof of a joint venture agreement between Cortez and B & T would not alone bar appellant, the employee of B & T, from proceeding in tort against Cortez. Professor Larson, in discussing the loaned servant doctrine, points out the necessity of proving a contract of hire between the employee and his special, as opposed to his general, employer:

> In compensation law, the spotlight must now be turned upon the employee, for the first question of all is: Did he make a contract of hire with the special employer? If this question cannot be answered "yes," the investigation is closed, and there is no need to go on into tests of relative control and the like.
>
> This must necessarily be so, since the employee loses certain rights along with those he gains when he strikes up a new employment relation. Most important of all, he loses the right to sue the special employer at common law for negligence; and when the question has been presented in this form, the courts have usually been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit.

1A Larson, Workmen's Compensation Law, § 48.10 at 806 (1967).

Like most workmen's compensation Acts, the Louisiana statute provides that the employee under the Act cannot proceed in tort against his employer. La. Rev.Stat.Ann. § 23:1032 (1964).

There is no evidence in the record before us that Kridler gave "deliberate and informed consent" to becoming an employee of the alleged joint venture or even knew of the existence of it. The theory that a workman employed by one employer subject to the compensation act is stripped of his non-statutory rights to proceed against a third-party tortfeasor for negligence by reason of private and unknown joint venture arrangements between his employer and the third party, simply falls upon assertion. This is especially apparent in the construction industry, in which often many different employers carry on hazardous work on the same job site and informal arrangements to share equipment and profits are common. Compare the converse situation in which the employee of a joint venture may claim compensation benefits from either or both parties to the venture. Babineaux v. Southeastern Drilling Corp., 170 So.2d 518 (La.App.), writ ref'd, 247 La. 613, 172 So.2d 700, appeal dism'd, Seacat Marine Drilling Co. v. Babineaux, 382 U.S. 16, 86 S.Ct. 67, 15 L.Ed.2d 12 (1965). This case construes La.Rev.Stat. § 23:1031, which governs payments to an employee "employed and paid jointly by two or more employers subject to [the Act]."

The parties have not addressed themselves to the finding that Cortez was a sub-contractor under B & T, and to the consequences thereof under the Louisiana workmen's compensation laws, therefore we leave for the district court in a new trial the determination of the relationship which existed and the legal consequences flowing from it.

block the operator's view. The operator saw him immediately and could see the jar, and smiled and nodded his head.

Appellant turned or veered to his right to walk away. The bulldozer was then heading off to his left and not toward him. He was 20 to 30 feet off to its right side. Three or four seconds after he turned and began to move away he was struck from behind by the tree or limb and knocked down. He was rolled 30 to 40 feet. The driver came down to assist him and said, "I seen you standing there and when I looked around you were gone."

 Viewing this evidence in the light most favorable to appellant, and giving him the advantage of every fair and reasonable intendment, as the court was required to do, Isaacs v. American Petrofina, 368 F.2d 193 (5th Cir. 1966), it was for the jury to determine whether the operator was negligent in continuing the forward movement of the bulldozer after observing Kridler standing 20 to 30 feet away and holding the water jar, and, having seen Kridler, in taking his eyes off him. And it was for the jury to decide whether appellant was negligent in approaching 20 to 30 feet from the moving machine and in turning away from it after he saw that the operator had become aware of his presence. The evidence of negligence and contributory negligence is of such character that reasonable men in the exercise of impartial judgment may reach different conclusions. Ricketson v. Seaboard Airline R.R., 5th Cir. 1968, 403 F.2d 836 [Nov. 15, 1968].

 In granting the motion the trial judge applied an improper standard. He announced that he gave little credence to Kridler's testimony because it was in his own interest and because Kridler had made a misstatement in a document that was in evidence (a job ap-

plication form, discussed below.) A motion for directed verdict must be acted on without weighing credibility of witnesses, which is for the jury. M. C. Carlisle & Co. v. Cross, 386 F.2d 672 (1st Cir. 1967); Monsanto Chemical Co. v. Payne, 354 F.2d 965 (5th Cir. 1966); United States v. Edwards, 333 F.2d 575 (5th Cir. 1964); Breland v. United States, 323 F.2d 492 (5th Cir. 1963); 5 Moore, Federal Practice, ¶50.02, at 2321 (1968); 2B Barron & Holtzoff, Federal Practice and Procedure, § 1075, at 385 (1961).[3] This is equally true of assigning weight to testimony based on the interest of the witness.

Therefore, we hold that it was improper for the trial judge to direct a verdict in favor of Travelers.

### 2

### The Workmen's Compensation Claim

The trial judge denied the workmen's compensation claim against Bituminous and Aetna on the ground appellant had failed to prove by a preponderance of the evidence that he was entitled to further compensation benefits under the Louisiana compensation law as a consequence of the first accident.[4]

 The court applied an improper standard of law in putting upon appellant the burden of proof of causation. There were three relevant inquiries— whether there was an accident on May 21, 1961, whether the appellant was suffering a disability, and if there was disability whether it was a consequence of that (first) accident.

 The occurrence of the accident was proved, as discussed above. The existence of disability was proved. We discuss this below. Once the occurrence of the accident and the existence of medically related disability were proved the burden was upon the employer to

---

3. See also Turner v. Southern Industries Company, 88 So.2d 238 (La.App.1956), holding that a misstatement by an applicant for employment, in his application, that he has suffered "no accidents" has little, if any, relevance to whether he will give false testimony under oath in court.

4. His opinion is reported at 258 F.Supp. 299 (E.D.La.1967).

prove that the disability did not occur as a consequence of that accident but from some other cause. In Richard v. Barber Brothers Co., 112 So.2d 168, 170 (La.App.1959) the court said:

[W]here a continued disability is proven which relates back to the initial accident during the employment, the burden is on the employer to prove that some other accident caused the disability and not upon the employee to prove that no other accident occurred.

In Turner v. Southern Industries Co., 88 So.2d 238 (La.App.1956) cert. denied, there was a factual dispute whether there had been an industrial accident. The Louisiana Court of Appeals held that an industrial accident had occurred and the trial court had erred in finding to the contrary, and that as a matter of law the burden was not upon the employee to prove that between the accident and the time of medical treatment he had suffered no strain or aggravation which produced his disability. See also Stroud v. Tremont Lumber Co., 193 So.2d 86 (La.App.1966).

To a large extent the evidence that appellant suffers a disability is undisputed, though the extent of his disability is a matter to be resolved by a trier of fact. There was a difference of diagnosis between two doctors, one of whom thought appellant had suffered a torn meniscus (cartilage of the knee), while the other had not diagnosed a torn meniscus. Dr. Newman, an orthopedist, treated appellant for the first injury. He saw him on his admission to the hospital on May 21 and treated him at the hospital until hospitalization ended. He last saw him as an out-patient on June 13. Exactly when hospitalization terminated is not clear. Dr. Newman's testimony is cursory, less than two pages of the record. We quote it in toto.[5] His testimony tells us only two things about injuries—that appellant had "a closed comminuted fracture proximal metaphysis and lateral plateau of the left tibia," and, that he did not make a diagnosis of a torn meniscus. The trial judge found that Dr. Newman concluded that appellant needed no further treatment after June 13, and that "at the time of his discharge by Dr. Newman, he [Dr. Newman] found no residual disability." As shown by Dr. Newman's brief testimony, he did not testify as to disability as of June 13, or

---

5. DIRECT EXAMINATION

MR. ALSOBROOK: Will you stipulate that Dr. Newman is an orthopedist?

MR. KEEGAN: Yes, sir. Are you Board Certified?

THE WITNESS: Yes.

MR. KEEGAN: We will stipulate he is an expert.

BY MR. ALSOBROOK:

Q. Doctor, did you have occasion to treat a man whose name is Roy Kridler?

A. Yes, sir.

Q. And would you tell us, please, sir, the way that you treated him and what his injuries were?

A. I treated him at the St. Claude General Hospital. I notice the chart here.

Q. You may refer to it, if you would like.

A. He had a fracture, a closed comminuted fracture proximal metaphysis and lateral plateau of the left tibia.

Q. Doctor, could you tell us how long you treated him?

A. He was essentially treated during his hospitalization as well as I saw him once as an out-patient in my office down there on June 13, 1961.

Q. And you saw him no further time after June, 1961? What was that date?

A. June 13, 1961.

Q. And you saw him no more after that?

A. No, I did not.

Q. And when was the first time you saw him?

A. On his admission on May 21, 1961.

Q. Now, Doctor, when you last saw him, did this man have any radiological evidence of a torn meniscus?

A. I didn't x-ray him the last time I saw him.

Q. When did you x-ray him the first time?

A. That is not an x-ray diagnosis.

Q. Well, did you make a diagnosis of a torn meniscus?

A. No, I did not.

MR. ALSOBROOK: That's all the questions I have, your Honor.

MR. KEEGAN: No questions.

THE COURT: Thank you very much, Doctor.

(Witness excused.)

as of any other time, or as to need for further treatment. Nor is there any other evidence in the record that Dr. Newman reached either of the conclusions attributed to him by the court.[6]

In the second accident appellant was pinned between a tractor and a wooden mat, which was being moved into position on uneven ground to support the movement of a pile driver, and fell to the ground on his back. After hospitalization he was discharged by the doctor (not identified) on January 30, 1962, as "completely recovered from the effects of the injury to his pelvis." 372 F.2d at 946.

On September 5, 1962 appellant was examined by Dr. Cahen at the request of the attorney for Highlands Insurance Company in the second injury suit. Dr. Cahen's examination was not directed to the second (pelvic) injury. Rather it was expressly related to the first accident and the injuries suffered therefrom.[7]

Dr. Cahen testified in the instant case as to what he found concerning appellant's left leg and knee. His testimony was detailed, complete and thorough. He obtained a history. He made an examination of appellant. *He had available to him the X-ray records of the treating physician (Dr. Newman), who did not testify with respect to them.* He conducted his own physical tests, including rotational tests of the knee joint, and made his own physical findings. He directed that residual X-ray studies be made, and considered them.

Based on the foregoing, plus his experience with this type of injury, he concluded that appellant had suffered a closed comminuted fracture of the tibia involving the collateral ligament of the knee, the crucial ligament of the knee, and the cartilage or meniscus of the joint. His opinion was that there was torn cartilage in the knee, and the knee could lock if the cartilage separated.

He found the left leg to be unstable. He found instability of the left knee joint with some atrophy of the small musculature, slight abnormality or instability of the joint in a forward-backward movement. He considered that actual clinical studies seemed to be correlated to X-ray evidence of injury to the plateau or joint surface of the knee, involving the tibial bone. X-rays showed a tilt or bowing of the surface of the knee bone. It was his opinion that appellant would suffer pain on use of the left leg, diminishing with rest.

Dr. Cahen's opinion was that the effectiveness of the leg and knee was diminished thirty to thirty-five percent. His opinion was that the conditions would worsen. He recommended surgery.[8]

A considerable part of the opinion of the district judge was directed to the question of damage to the meniscus. In cross-examination of Dr. Cahen appellees focused, as they did in their brief examination of Dr. Newman, on whether there was cartilage injury. In this Court appellees state that appellant "contends that he received a torn meniscus", and then pursue that narrowed characterization as though it is dispositive of all issues. The characterization is inaccurate. There is much more at issue than torn cartilage.[9] Appellees' characterization fails to reach the findings of Dr. Cahen going to the entire spectrum of the injury, to the condition of the knee and leg, instability of the leg, instability of

---

6. We know when Dr. Newman last saw appellant. We do not know whether he discharged appellant.

7. We assume that counsel for Highlands desired to establish whether such disability, if any, as appellant was then suffering related to the leg-knee injury and not to the fractured pelvis.

8. In a pre-trial motion seeking to have Bituminous Casualty furnish him surgical attention, and in testimony, appellant stated his willingness to have surgery on the knee.

9. The complaint, amended complaint, and pre-trial order all refer to injury to and disability of the left leg. In answers to interrogatories Bituminous Casualty described the injury as a broken leg.

the knee, atrophy of the muscular structure, injury to the plateau or joint surface, damage to the collateral ligament and the crucial ligament, and tilt or bowing of the knee surface.

■ The existence of disability is not eliminated by the facts of appellant's present employment. The district court found that appellant is doing "the same kind of work that he has always done, apparently with little or no difficulty." The evidence does not support either of these two conclusions. Appellant's testimony was that at the time of trial he was employed in a parish engineer's office, supervising laying out of streets, lots, grading of ditches, laying out ditches and general field work and general survey work, at least substantial parts of which are in developed areas. Although he has not missed work since the second accident as a result of the first accident, he has not pursued general construction work because of the consequences of working with an insecure leg in construction areas, where there may be debris, holes and foundations in and out of which and around which one must work. He has a problem in walking over rough terrain, swampy areas, and slush and mud. He does not feel that he can work around heavy mobile equipment because of the necessity of fast movement to get out of the way. His leg pains him on prolonged standing. The foot is drawn into an angle in the morning and for a time he walks only on a portion of the side of the foot. This is all the evidence on the issue of the type of work done by appellant at the time of trial and the difficulty of doing it.[10]

■ When appellant applied to Brown & Root in October, 1961 for em-ployment as an instrument man-engineer, as a part of his application he filled out a "Physical Examination Record," on which he answered that he had had no injuries, had not drawn compensation, had had no operations and had not been under the care of a doctor in the past five years. These statements were, of course, untrue. But they do not alter the fact that appellant did suffer a knee injury in the first accident and that the condition of his knee in September, 1962 was related to that accident by Dr. Cahen.[11] A physician (now deceased), as medical examiner for Brown & Root, approved appellant's employment as an instrument man doing survey work. He filled out a brief form showing chest, heart and arteries normal, urine, albumin and sugar negative, and no hemorrhoids, deformities, scars or venereal condition, and giving weight and height and similar data, blood pressure and pulse. There were no entries relating to knees, legs, extremities, bones, joints, and no evidence that examiner examined them.

■ Appellant did prove that an accident occurred and that he is under a medically related disability. The burden then was upon the employer to show that the disability came from other causes. To place the burden upon appellant was reversible error.

Appellant attached to his brief and requested our consideration of a report purportedly signed by Dr. Newman which he contends shows facts inconsistent with Dr. Newman's testimony. No grounds are offered on the basis of which we could consider the document and we have not done so.

Reversed and remanded.

10. There is one reference to appellant's doing survey work for another private concern before accepting employment with the parish engineer. There is no testimony of what the work involved.

11. "[T]he test of recovery in a compensation case is not veracity but disability." Richard v. Barber Brothers Company, *supra*, 112 So.2d at 171. *Accord*, Johnson v. Calcasieu Paper Co., 95 So.2d 659 (La. App.) cert. denied.